UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| NAVY E. KEELING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 10-23-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| HORIZONS YOUTH SERVICES, L.C., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Horizons Youth Services, L.C. ("Horizons"), has moved the Court for summary judgment in this matter. [Record No. 28] Horizons argues that no genuine issue of material fact remains with respect to Plaintiff Navy E. Keeling's ("Keeling") claims of employment discrimination and retaliation. For the reasons discussed below, the Court will grant Horizons' motion.

**I.**

This case arises out of termination of employment at the Whitney M. Young Job Corps Center. The Job Corps program is run by the United States Department of Labor, which contracts with entities such as Horizons for management of the Center. [*See* Record No. 28-6, pp. 4, 7-8.] Keeling was hired in July 2002 as a Security/Transportation Officer by a predecessor of Horizons. He was subsequently promoted, first to Senior Security Officer (2004), and then to Security Manager (2005). Keeling became an employee of Horizons on May 1, 2008. [Record No. 28-4, p. 6] He was an at-will employee. [*Id.* at 103]

Prior to 2008, Keeling reported to Center Director Ian Crump. At some point that year, however, Carolyn Savko was appointed to supervise the security department and became Keeling's direct supervisor. [*See id.*, p. 36; Record No. 28-5, p. 55; Record No. 28-6, pp. 5, 7.] Keeling testified at his deposition that he and Savko generally got along but "butted heads" on more than one occasion. [Record No. 28-5, p. 58; *see id.*, pp. 58-60] Keeling also testified about conflicts that had arisen between him and several other Horizons employees before he took medical leave in October 2008. [*See id.*, pp. 40-45.]

Keeling's March 31, 2008, performance evaluation stated that his "efforts and dedication continue[d] to be outstanding"; however, the evaluation listed a number of changes that "need[ed] to be implemented immediately." [Record No. 31-2, p. 58] His previous evaluation noted his "[d]edicated efforts," as well as his "'can-do' and 'taking care of business' attitude," but likewise pointed out several areas for improvement. [*See Id.*, p. 59 (evaluation dated Feb. 29, 2008).] A more comprehensive evaluation prepared for Keeling in the fall of 2008 indicated that he barely met expectations overall and needed improvement in his departmental performance. [*Id.*, pp. 53-57; *see* Record No. 28-4, pp. 35-36.] Because he was on medical leave, however, Keeling was not presented with that review. [Record No. 28-4, pp. 35-36, 40] At the time he began his medical leave, no disciplinary action had been taken against him. [*See id.*, p. 16.]

Keeling was on leave from October 2, 2008, until February 16, 2009, as a result of a heart condition.[1] [Record No. 28-5, p. 109] During his leave, he made multiple telephone calls to the

---

1 Keeling testified that he has no complaints about the way Horizons handled his FMLA leave from an administrative standpoint, or about the amount of leave time he received. [Record No. 28-5, pp. 114-15]

Center to speak to employees in the security department. [*Id.*, p. 115] The parties dispute the content of these calls. According to Keeling, he was calling to "see how everything[] [was] going." [*Id.*] He acknowledges telling the employees that he would handle certain issues when he returned from medical leave. [*Id.*, pp. 115-17] Horizons maintains that Keeling was instructing employees to ignore their acting supervisor (Savko) and telling them that things would change when he got back. [*See* Record No. 28-4, pp. 18-20.] It is undisputed that as a result of Keeling's phone calls to the Center, he was told by Crump not to contact the security department while he was on leave. [*See id.*, p. 25; Record No. 28-5, pp. 118-19, 120-23.] Crump characterized the calls as disruptive. [Record No. 28-5, p. 123]

When Keeling returned to work at the Center on February 16th, he was instructed to report for a meeting in Crump's office before checking in at the security department. [*Id.*, pp. 125-26; Record No. 28-4, pp. 49-50] In addition to Keeling and Crump, the meeting included Savko, as well as Human Resources Manager Joy Bruniga.[2] [Record No. 28-5, p. 125; Record No. 31-2, pp. 51-52] Keeling recalls that the tone of the meeting was positive. [Record No. 28-5, p. 141] He remembers Crump "saying that we're going to put you on a plan." [*Id.*, p. 131] Crump also told Keeling that he needed to be a manager, not a friend, to his employees. [*Id.*, p. 138] According to Keeling, his response was that he was "going to try to do better, different than what [he] was before" and that he "ha[d] to change some things and try to work through it." [*Id.*]

---

2   Bruniga apparently had a different last name at the time of the meeting. [*See* Record No. 31-2, p. 51.]

Also discussed during the meeting was an impending change in Keeling's work schedule. [*See id.*, p. 132] Keeling expressed concern that a new schedule might interfere with his church activities on Wednesday and Thursday evenings. [*Id.*] Prior to his medical leave, the schedule did not conflict with Keeling's Wednesday-night church attendance, and he was permitted to leave work early on Thursdays for "praise and worship practice."[3] [*Id.*, p. 133; *see id.*, pp. 134-35.] After further discussion following the February 16th meeting, Crump told Keeling that he would have to choose one day or the other. [*Id.*, p. 135] Keeling ultimately chose to miss practice on Thursdays. [*Id.*, p. 133] He was allowed to leave early on Wednesdays to attend church. [*Id.*, p. 135]

In March 2009, Savko drafted a performance improvement plan (PIP), or corrective action, outlining numerous deficiencies in Keeling's job knowledge, quality of work, adaptability/flexibility, teamwork/cooperation, communication, training, and management/leadership. [Record No. 31-2, pp. 47-49; *see* Record No. 28-4, p. 52.] The document stated that Keeling's progress would be monitored for the next sixty days and that if he failed to meet the expectations set forth in the improvement plan, he would be subject to "further disciplinary action up to and including termination." [Record No. 31-2, p. 49] Savko discussed the PIP with Keeling on April 3, 2009. [Record No. 28-5, p. 151] Keeling testified that at the end of his meeting with Savko, he did not have a problem with the PIP or with working to improve his performance. [*Id.*, p. 165]

---

3   Keeling explained during his deposition that praise and worship practice is "[w]here we practice singing. We go over songs and things we're going to do on Sunday morning." [Record No. 28-5, p. 133]

Savko drafted a second PIP in early May 2009 addressing Keeling's failure to comply with the previous improvement plan. [Record No. 31-2, pp. 42-45] Keeling was presented with that PIP, as well as a third drafted by Crump, during a meeting with Crump and Bruniga on May 14. [Record No. 28-5, pp. 170-71] The third corrective action, dated May 11, concerned Keeling's failure to substantiate his claim that he had to be absent from work as a result of his wife's possible exposure to the H1N1 virus. [Record No. 31-2, pp. 37-40] Crump believed that the situation called Keeling's honesty into question and "negate[d] the level of trust and confidence . . . required of [his] position." [*Id.*, p. 37]

Upset by the corrective actions, Keeling informed Crump and Bruniga that he was tendering his resignation.[4] [Record No. 28-5, pp.171-72] Later that day, however, he went to Bruniga's office and tearfully explained that he did not actually want to quit. [*Id.*, p. 174; Record No. 28-4, p. 56] The following morning, Keeling received a call from Crump, who said he wanted to meet with Keeling to offer him a different position. [Record No. 28-5, pp. 174-76] According to Keeling, Crump told him, "'Normally if somebody tells me they're going to resign, that's it. . . . But I'm going to offer you this other job.'" [*Id.*, p. 176] Keeling also testified that when he had first taken the managerial position, he had asked Crump whether he could have his old job (senior security officer) back if he "d[id]n't make it as a manager," and Crump refused. [*Id.*, p. 175] Nevertheless, after Keeling had given notice of his resignation, Crump offered to allow him to return to his previous position. Keeling accepted the offer. [*Id.*]

---

4    Keeling testified that he resigned because Crump told him he would be terminated if he did not make the necessary improvements within thirty days. [*See* Record No. 28-5, pp. 171-72.]

Keeling subsequently appealed the three corrective actions. [*See* Record No. 28-4, pp. 55-56, 67] As a result of the appeals, each corrective action was amended to reflect a lower level of seriousness. [*Id.*, pp. 58, 69] The appeals process concluded in late June 2009. [*See* Record No. 31-2, p. 6]

On July 6, 2009, Keeling filed a claim with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had suffered discrimination on the basis of a disability in violation of the Americans with Disabilities Act. [*See* Record No. 1-4.] Thereafter, he was twice instructed by Horizons CEO John Hall not to discuss his EEOC claim with other employees. [Record No. 28-5, pp. 195-97] Despite Hall's explicit instruction, Keeling met with his immediate supervisor, Gary Sharp, for the purpose of telling him about the EEOC claim. [*Id.*, pp. 197-99] Keeling testified at his deposition that he believed he was entitled to tell Sharp about the claim because it was his own "personal business." [*Id.*, p. 199] Sharp later submitted a statement to Horizons management recounting his conversation with Keeling. [Record No. 31-3, p. 1 (statement dated Aug. 7, 2009)] According to Sharp's statement, Keeling advised him on July 31, 2009, that he had filed "an EEO lawsuit" against Horizons for discrimination and that he "just wanted [Sharp] to be aware of the suit." [*Id.*]

The day after his meeting with Sharp, Keeling was involved in a verbal confrontation with Horizons employee Bill Baker. [*See* Record No. 28-5, p. 205] While Keeling maintains that the two did not have a heated altercation, it is undisputed that Baker accused Keeling of lying and that Keeling threatened Baker with legal action. [*See id.*, pp. 206-07; Record No. 31-3,

pp. 2-4, 7] The exchange was witnessed by at least one other Horizons employee, as well as by students at the Center. [*See* Record No. 28-4, pp. 87-88; Record No. 31-3, p.7.]

After conducting an investigation into the Baker incident, Horizons terminated Keeling's employment on August 7, 2009. [Record No. 28-4, p. 107; *see* Record No. 31-4.] The reasons cited for his termination were insubordination (*i.e.*, disregarding Hall's directive not to speak to employees about his EEOC claim) and the confrontation with Baker. [Record No. 28-5, p. 204] On October 28, 2009, Keeling filed a second claim with the EEOC, alleging that he had been fired in retaliation for his first EEOC claim. [Record No. 1-5] On January 19, 2010, he was notified by the EEOC of his right to sue. [Record No. 1-6]

Keeling filed the present action on April 16, 2010, alleging employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17; the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654; the Workforce Investment Act ("WIA"), 29 U.S.C. §§ 2801–2945; and Kentucky Revised Statutes ("KRS") §§ 344.010–.990 [Record No. 1, pp. 5-6] In his response to Horizons' motion for summary judgment, however, Keeling abandoned all but three claims: (1) retaliation under the FMLA, (2) retaliation for filing an EEOC claim, and (3) religious discrimination. [*See* Record No. 31, p. 1] Accordingly, the Court's analysis will be limited to those three claims.

**II.**

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* (c)(1). In deciding whether to grant

summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, the nonmoving party must establish the existence of a genuine issue of material fact as to each essential element of its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Before proceeding, the Court notes that Keeling's "Response and Memorandum of Law to Defendant's Motion for Summary Judgment" contains no legal argument and not a single case citation. [*See* Record No. 31] His counsel has made no apparent effort to set out the necessary prima facie case with respect to each claim, or even to identify the requirements of such. Accordingly, the Court's analysis will be conducted without the benefit of argument in support of Keeling's position. Regardless of his counsel's puzzling failure, however, Keeling's claims are not supported by the evidence of record.

### A.     FMLA Retaliation

Keeling's FMLA retaliation claim must be analyzed under the burden-shifting test set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). At the first stage of the *McDonnell-Douglas* test, the plaintiff must present a prima facie case. *Burdine*, 450 U.S. at 252-53. To establish a prima facie case with respect to his FMLA retaliation claim, Keeling must show that (1) he engaged in activity protected under the FMLA (*e.g.*, by taking FMLA leave to which he was entitled); (2) he "suffered an adverse employment action"; and (3) "there was a causal connection between the adverse employment action and the protected activity."

*Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

The first element is clearly satisfied here. Keeling took FMLA leave, and Horizons does not challenge his entitlement to that leave. Keeling's termination would easily satisfy the adverse-action element. But Keeling has not alleged that he was fired in retaliation for taking leave; instead, he identifies "the development of a corrective action plan upon his return from [FMLA] leave" and "the forced acceptance of an altered schedule in conflict with religious practice" as the allegedly retaliatory actions.[5] [Record No. 1, p. 5 ¶ 17; *see* Record No. 31, p. 9.]

"Not every act affecting an individual's employment can be considered an adverse employment action," however. *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005) (combined analysis of adverse-action elements of FMLA retaliation and Title VII discrimination claims). Rather, an adverse employment action is one that "work[s] a 'materially adverse change in the terms and conditions of [the plaintiff's] employment.'" *Id.* (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). The Sixth Circuit has explained that "'[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Tepper*

---

5   In his response to Horizons' motion for summary judgment, Keeling also lists his supposed demotion, along with the pay and benefit reductions that accompanied it, as an "adverse employment consequence[]" that followed his FMLA leave. [Record No. 31, p. 9] He made no such assertion in his Complaint, however. [*See* Record No. 1, p. 5 ¶ 17] In any event, the Court rejects Keeling's attempt to characterize his change in position as a "demotion," as his own deposition testimony clearly establishes that he was offered the senior-officer position only after he had expressed his intent to resign as security manager, and further, that Crump made an exception in offering to let him return to his previous position. [*See* Record No. 28-5, pp. 173-76.]

*v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (quoting *Ford v. GMC*, 305 F.3d 545, 553 (6th Cir. 2002)). Keeling has not shown that the implementation of a performance improvement plan or a change in work schedule would reach this level of significance. Because he did not suffer an adverse action, his prima facie case of FMLA retaliation fails.

### B. Title VII Retaliation

A plaintiff alleging retaliation under Title VII must make a prima facie showing that: (1) he "engaged in activity protected by Title VII'"; (2) his "'exercise of his civil rights was known by the defendant'"; (3) "'thereafter, the defendant took an employment action adverse to the plaintiff'"; and (4) "'there was a causal connection between the protected activity and the adverse employment action.'" *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997)). If the plaintiff fails to demonstrate a dispute of material fact with respect to any one of these elements, summary judgment is appropriate. *Id.* If, however, the prima facie elements are met, the burden shifts to the defendant, which must "articulate a nondiscriminatory reason for its actions." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). The plaintiff must then demonstrate that the stated reason is pretextual. *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002)). This showing can be made through evidence that the stated reason "'(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Id.* (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

There is no question that Keeling engaged in protected activity by filing a claim with the EEOC. It is likewise undisputed that Horizons was aware of Keeling's claim before he was fired. [*See* Record No. 31-3, p. 12 (notification of Keeling's claim from EEOC to Horizons dated July 16, 2009); Record No. 31-4 (termination letter dated August 7, 2009); *see also* Record No. 31-3, p. 8 (July 20, 2009 e-mail from Savko to Bruniga indicating that Savko had learned of Keeling's EEOC claim from another employee).] Thus, the only element in question is causation.

Keeling confidently asserts that "[t]he chronology of events" in the weeks following his first EEOC claim "clearly demonstrate[s] the retaliatory nature and intent of the [d]efendant." [Record No. 31, p. 9] However, his argument — to the extent he makes one — focuses exclusively on whether Horizons' stated reasons for firing him were pretextual. [*See id.*, pp. 9-11] The Court may not skip ahead to the issue of pretext without first determining whether there is a causal connection. *Cf. Grubb v. YSK Corp.*, 401 F. App'x 104, 112 (6th Cir. 2010) ("[I]t is improper for Grubb to attempt to prove that YSK's actions were pretextual prior to establishing a causal connection between his use of FMLA leave and his termination." (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc))). Giving Keeling the benefit of all reasonable inferences, the Court will consider whether the timing of his termination constitutes evidence of a causal relationship.

Temporal proximity alone may be sufficient to establish causation in a retaliation case. *See Mickey*, 516 F.3d at 525. However, it suffices only in the "limited number of cases . . . where an employer fires an employee immediately after learning of a protected

activity." *Id.*; *see also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[The Sixth] Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."). In the present case, Horizons learned of Keeling's EEOC claim sometime after July 16th, and he was fired less than a month later. Thus, the termination cannot be described as "immediate." *Cf. Mickey*, 516 F.3d at 525 (employee fired same day employer learned of EEOC claim). Therefore, Keeling must provide additional evidence of retaliatory intent in order to establish causation. *See id.* at 525-26.

Keeling offers no such evidence. Instead, he seems to assume that his termination was prompted by his EEOC claim simply because he was fired after filing the claim. [*See* Record No. 1, p. 5 ¶ 16 ("On or about July 6, 2009, Plaintiff Keeling filed a charge of discrimination with the United States EEOC related to the conduct of Defendant Horizons. On August 7, 2009, following service of the EEOC charge upon the Defendant Horizons, the employment of Plaintiff Keeling was terminated."); Record No. 31, pp. 9-11 (discussing events that occurred between filing of EEOC claim and termination, without explanation or argument as to how the two might be related).] Keeling has failed to show a causal connection between the two events.

Even if there were sufficient evidence of causation, Keeling's EEOC retaliation claim would fail the pretext inquiry. Horizons cited two nondiscriminatory reasons for firing Keeling: insubordination and his verbal confrontation with Baker. [*See* Record No. 28-5, p. 204] Since Keeling does not dispute that the cited incidents occurred [*see id.*, pp. 195-206, 219], he cannot

argue that the reasons given for his firing are without basis in fact.[6] *See Mickey*, 516 F.3d at 526. Furthermore, he has not shown that Horizons' decision to fire him was not actually motivated by those incidents, or that the conduct he engaged in was insufficient to warrant his termination. *See id.* His EEOC retaliation claim, therefore, is doomed in any event.

### C. Title VII Discrimination

Keeling's religious-discrimination claim is also evaluated using the *McDonnell-Douglas* burden-shifting framework. *See Tepper*, 505 F.3d at 515. To make a prima facie showing of religious discrimination, Keeling must establish: "(1) that he was a member of a protected class, (2) that he experienced an adverse employment action, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class or that he was treated differently than similarly situated [non-protected] employees." *Id.*; *see Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *DiCarlo*, 358 F.3d at 415). As before, if Keeling can make a prima facie showing, the burden of production shifts to Horizons "to articulate a legitimate, nondiscriminatory reason" for firing him. *Tepper*, 505 F.3d at 515. He must then demonstrate that the stated reason is pretextual. *Id.* at 515-16. To survive summary judgment on his Title VII discrimination claim, Keeling must establish a genuine issue of material fact "'at each stage of the *McDonnell[-]Douglas* inquiry.'" *Blair v. Henry Filters, Inc.*, 505 F.3d 517,

---

6      Keeling testified that he did not yell at Baker and that the incident was not a "heated altercation." [Record No. 28-5, p. 206] Nonetheless, it is apparent from his description that the encounter was confrontational and took place in front of other employees. [*See id.*] Furthermore, Keeling indicated both during his deposition and in his summary judgment response that the statement of Deborah Cottle, an employee who witnessed the incident, accurately reflects what occurred. [*See id.*; Record No. 31, p. 11.] According to Ms. Cottle's statement, Keeling informed Baker that he would "see [him] in court," accused Baker of being the reason he was no longer manager, and told Baker that he was "tired of [his] attitude" and that Baker "ha[d] a bad attitude and . . . need[ed] to change it." [*See* Record No. 31-3, p. 7.]

524 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). His claim falls short of this standard on a number of grounds.

### 1. Religious Discrimination

Horizons does not dispute that Keeling is a member of a protected class or that he was qualified for the position he held. According to Horizons, however, Keeling did not suffer an adverse employment action because he was not fired or disciplined on account of his religious activities. [*See* Record No. 33, p. 4.] This argument is relevant to the issue of pretext, not to whether an adverse action occurred. Nevertheless, the Court notes that Keeling does not claim to have been fired because of his religion. Rather, he simply argues that he was forced to accept a work schedule that conflicted with his religious activities.[7] [*See* Record No. 1, pp. 4 ¶ 13, 5 ¶ 17; Record No. 31, pp. 6, 9] To satisfy the adverse-action prong in a religious-discrimination case, the employer's action must be "materially adverse"; that is, it must amount to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. [It] must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Tepper*, 505 F.3d at 515. A schedule change that forces an employee to choose between Wednesday-night church service and Thursday-night music practice does not constitute "a significant change in employment status," *id.*, and is not a materially adverse employment action. *See id.*

---

7   In fact, Keeling presents the schedule change primarily as evidence in support of his FMLA retaliation claim. [*See* Record No. 31, p. 9 ("[A]s a result of the corrective actions within four months of his return from medical leave, Plaintiff had the following adverse employment consequences: Revised schedule that conflicted with his religious practices . . . .").]

Assuming that Keeling's termination, not the schedule change, is the relevant adverse action, his claim of religious discrimination still fails because he has not shown that he was replaced by someone with different religious views; nor has he identified any similarly situated, non-protected Horizons employee who was treated differently. *See Wright*, 455 F.3d at 707. He thus has not established a prima facie case. *See id.* And even if his claim could pass the prima facie stage, it would not satisfy the pretext requirement, as there is no evidence whatsoever that Horizons' decision to fire him was based on the religious nature of his activities. *Cf. Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000) (finding that plaintiff failed to establish pretext where there was no evidence "that it was the religious aspect of her leadership position [with a church supportive of homosexuality] that motivated her employer's actions"). In short, the record is devoid of evidence to support a finding that Horizons discriminated against Keeling on the basis of his religion.

### 2. Religious Accommodation

Although Keeling does not expressly assert a religious-accommodation claim in either his Complaint or his response to the summary judgment motion, the Court notes that such a claim is likewise unsupported by the evidence. In a religious-accommodation case, the plaintiff must make a prima facie showing that: "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Reed v. UAW*, 569 F.3d 576, 580 (6th Cir. 2009) (internal quotation marks omitted). The Court assumes that the first two elements are met in this case. There is no evidence, however, that

Keeling "was discharged or disciplined for failing to comply with" the new work schedule. *Id.* On the contrary, Keeling testified that Crump agreed to modify the schedule so that he could leave early on Wednesdays to attend church. [*See* Record No. 28-5, p. 135] The Sixth Circuit "ha[s] declined to relieve a religious accommodation plaintiff of his burden to establish a prima facie case, including the requirement that he demonstrate that he has been discharged or disciplined." *See Reed*, 569 F.3d at 580 (citing *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 637 (6th Cir. 2003)). Because the scheduling conflict did not lead to termination or punishment, Keeling's Title VII claim could not survive summary judgment on a religious-accommodation theory.

### 3. Exhaustion of Administrative Remedies

Finally, even if these myriad deficiencies could somehow be overlooked, Keeling's claim of religious discrimination is barred because he failed to exhaust his administrative remedies. Before pursuing a federal lawsuit, a plaintiff who alleges discrimination under Title VII must file a claim with the EEOC and obtain a right-to-sue letter. *See* 42 U.S.C. §§ 2000e-5(e), (f); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 731 (6th Cir. 2006) (citing *Brown v. GSA*, 425 U.S. 820, 832 (1976)). The EEOC filing requirement "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" *Randolph*, 453 F.3d at 732 (quoting *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980)). Accordingly, for purposes of determining whether a plaintiff has exhausted his administrative remedies, an EEOC filing "should be liberally construed to

encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id.* (quoting *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992)). Here, however, Keeling's EEOC charges cannot be construed to even hint at a religious-discrimination claim. The first filing alleged discrimination based solely on disability [Record No. 1-4], while the second simply alleged retaliation as a result of the first. [Record No. 1-5] Thus, Keeling has failed to exhaust his administrative remedies with respect to his Title VII discrimination claim, and the claim is barred.

### III.

Keeling has failed to present a prima facie case as to any of his three remaining claims. Moreover, his Title VII discrimination claim is barred because he did not exhaust his administrative remedies. Accordingly, it is hereby

**ORDERED** that Defendant Horizons Youth Services, L.C.'s Motion for Summary Judgment [Record No. 28] is **GRANTED**. The pretrial conference and trial dates are **VACATED** and **CANCELED**. Likewise, the deadline for submitting pretrial materials is **SET ASIDE**. A separate Judgment will be entered this date in favor of Defendant Horizons Youth Services, L.C.

This 5th day of July, 2011.



Signed By:
*Danny C. Reeves* DCR
United States District Judge